## YVON J. ALEXANDRE *v.* COMMISSIONER OF REVENUE SERVICES
### (SC 18417)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued January 13—officially released April 19, 2011

*Robert J. Percy*, for the appellant (plaintiff).

*Rupal Shah Palanki*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, former attorney general, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether summary cash register tapes, or "Z reports," which lack detail of individual transactions, satisfy a taxpayer's record keeping responsibilities under General Statutes § 12-426 (3)[1] and § 12-2-12 (b) (1) of the

---

[1] General Statutes § 12-426 provides in relevant part: " (1) The commissioner [of revenue services] shall enforce the provisions of this chapter and may adopt and enforce regulations relating to the administration and enforcement of this chapter. The commissioner may prescribe the extent to which any ruling or regulation shall be applied without retroactive effect. . . .

"(3) (A) Every seller, every retailer as defined in subparagraph (B) of subdivision (12) of section 12-407 and every person storing, accepting, consuming or otherwise using in this state services or tangible personal property purchased from a retailer shall keep such records, receipts, invoices and other pertinent papers in such form as the commissioner requires. . . ."

Regulations of Connecticut State Agencies.[2] The plain-

[2] Section 12-2-12 of the Regulations of Connecticut State Agencies provides in relevant part: "(b) Recordkeeping requirements.

"(1) A taxpayer shall maintain all records that are necessary to a determination of correct tax liability under the affected tax law provisions. All required records shall be made available upon request by the commissioner or his authorized representatives as provided for in the affected tax law provisions. Such records include, but are not limited to: books of account, invoices, sales receipts, cash register tapes, purchase orders, exemption certificates, returns, and schedules and working papers used in connection with the preparation of returns.

"(2) Failure to maintain such records will be considered evidence of negligence or intentional disregard of law or regulation and may, without more, result in the imposition of appropriate penalties.

* * *

"(5) Every taxpayer should make periodic checks on all records being retained for use by the commissioner. If any records required to be retained are subsequently lost, destroyed, damaged or found to be incomplete or materially inaccurate, the taxpayer shall recreate the files within a reasonable period of time.

"(c) Machine-sensible records.

"(1) General requirements.

"(A) Machine-sensible records used to establish tax compliance shall contain sufficient transaction-level detail information so that the details underlying the machine-sensible records can be identified and made available to the commissioner upon request. A taxpayer has discretion to discard duplicated records and redundant information provided its responsibilities under this section are met.

"(B) At the time of an examination, the retained records shall be capable of being retrieved and converted to a standard record format. The term 'standard record format' does not mean that every taxpayer shall keep records in an identical manner. Instead, it means that if a taxpayer utilizes a code system to identify elements of information in each record when creating and maintaining records, the taxpayer is required to maintain a record of the meaning of each code and any code changes and provide these to the commissioner to enable an effective review of the taxpayer's records.

"(C) Any system for creating, maintaining and retrieving machine-sensible records shall be able to accept date information input, provide date output, and store and perform calculations on dates before, on and after January 1, 2000 correctly and without ambiguity.

"(D) Taxpayers are not required to construct machine-sensible records other than those created in the ordinary course of business. A taxpayer that does not create the electronic equivalent of a traditional paper document in the ordinary course of business is not required to construct such a record for tax purposes.

"(2) Electronic data interchange requirements.

tiff, Yvon J. Alexandre, doing business as and the sole

"(A) Where a taxpayer uses electronic data interchange processes and technology, the level of record detail, in combination with other records related to the transactions, shall be equivalent to that contained in an acceptable paper record. For example, the retained records should contain such information as vendor name, invoice date, product description, quantity purchased, price, amount of tax, indication of tax status, shipping detail, etc. Codes may be used to identify some or all of the data elements, provided that the taxpayer provides a method that allows the commissioner to interpret the coded information.

"(B) The taxpayer may capture the information necessary to satisfy subparagraph (A) of this subdivision at any level within the accounting system and need not retain the original EDI transaction records provided the audit trail, authenticity, and integrity of the retained records can be established. For example, a taxpayer using electronic data interchange technology receives electronic invoices from its suppliers. The taxpayer decides to retain the invoice data from completed and verified EDI transactions in its accounts payable system rather than to retain the EDI transactions themselves. Since neither the EDI transaction nor the accounts payable system capture information from the invoice pertaining to product description and vendor name (i.e., they contain only codes for that information), the taxpayer also retains other records, such as its vendor master file and product code description lists, and makes them available to the commissioner. In this example, the taxpayer need not retain its EDI transaction for tax purposes.

\* \* \*

"(f) Taxpayer responsibility and discretionary authority.

"(1) In conjunction with meeting the requirements of subsection (d) of this section, a taxpayer may create files solely for the use of the commissioner. For example, if a database management system is used, it is consistent with this section for the taxpayer to create and retain a file that contains the transaction level detail from the database management system and that meets the requirements of subsection (d). The taxpayer should document the process that created the separate file to show the relationship between that file and the original records.

"(2) A taxpayer may contract with a third party to provide custodial or management services of the records. Such a contract shall not relieve the taxpayer of its responsibilities under this section.

\* \* \*

"(i) Time period for record retention.

"All records required to be retained under this section shall be preserved for so long as the contents thereof may become material in the administration of the taxes under the affected tax law provisions, but in no event less than three years from the extended due date of the return, unless the commissioner has provided in writing that the records are no longer required."

member of J.P. Alexandre, LLC, appeals[3] from the judgment of the trial court sustaining in part his tax appeal from the decision of the defendant, the commissioner of revenue services, which had assessed a sales and use tax deficiency and penalties, interest and fees (deficiency assessment). On appeal, the plaintiff claims that the trial court improperly: (1) concluded that his failure to retain detailed cash register tapes meant that he could not sustain his burden of proving that the defendant's decision to impose a deficiency assessment was incorrect; and (2) failed to discharge a tax lien that the defendant had placed on his real property in conjunction with a jeopardy assessment that the trial court determined had been improperly imposed pursuant to General Statutes § 12-417.[4] We conclude that the defen-

---

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 12-417 provides: "(1) If the commissioner believes that the collection of any tax or any amount of tax required to be collected and paid to the state or of any assessment will be jeopardized by delay, the commissioner shall make an assessment of the tax or amount of tax required to be collected, noting that fact upon the assessment and serving written notice thereof, personally or by mail, in the manner prescribed for service of notice of a deficiency assessment, on the person against whom the jeopardy assessment is made. Ten days after the date on which such notice is served on such person, such notice shall constitute a final assessment except only for such amounts as to which such person has filed a written petition for reassessment with the commissioner, as provided in subdivision (3) of this section.

"(2) The amount assessed is due and payable no later than the tenth day after service of the notice of assessment, unless on or before such tenth day the person against whom such assessment is made has obtained a stay of collection, as provided in subdivision (3) of this section. To the extent that collection has not been stayed, the commissioner may enforce collection of such tax by using the method provided in section 12-35 or by using any other method provided for in the general statutes relating to the enforced collection of taxes, provided, if the amount of such tax has been definitely fixed, the amount so fixed shall be assessed and collected, and if the amount of such tax has not been definitely fixed, the commissioner shall assess and collect such amount as, in the commissioner's opinion, from the facts available to the commissioner, is sufficient. If the amount specified in the notice of jeopardy assessment is not paid on or before the tenth day after

dant properly required the plaintiff to produce detailed cash register tapes to verify his gross receipts during the audit, and decline to reach the plaintiff's tax lien claim because he failed to raise it properly before the trial court. Accordingly, we affirm the judgment of the trial court.

The record reveals the following relevant facts, as found by the trial court, and procedural history. The plaintiff owns and operates a nightclub and banquet facility in Hartford that sells beer, liquor and food, all of which are subject to the Sales and Use Taxes Act (act), General Statutes § 12-406 et seq. The defendant conducted a sales and use tax audit of the plaintiff's business for the period of October 1, 1999, through March 31, 2005 (audit period). That process began when Louis Egbuna, one of the defendant's examiners, came to the plaintiff on December 20, 2001, and initially audited the period from October 1, 1999, through September 30, 2001. Prior to performing that visit, Egbuna

service of notice thereof upon the person against whom the jeopardy assessment is made, the delinquency penalty and the interest provided in section 12-419 shall attach to the amount of the tax or the amount of the tax required to be collected.

"(3) The person against whom a jeopardy assessment is made may file a petition for the reassessment thereof, pursuant to section 12-418, with the commissioner on or before the tenth day after the service upon such person of notice of the jeopardy assessment. Such person may obtain a stay of collection of the whole or any part of the amount of such jeopardy assessment by filing with the commissioner, on or before such tenth day, a bond of a surety company authorized to do business in this state or other security acceptable to the commissioner in such an amount not exceeding double the amount as to which the stay is desired, as the commissioner deems necessary to ensure compliance with this chapter, conditioned upon payment of as much of the amount, the collection of which is stayed by the bond, as is found to be due from such person. The security may be sold by the commissioner in the manner prescribed by section 12-430. At any time thereafter in respect to the whole or any part of the amount covered by the bond, such person may waive the stay, and if as the result of such waiver, any part of the amount covered by the bond is paid, the bond shall, at the request of such person, be proportionately reduced."

had requested that the plaintiff consent to an extension of the applicable statute of limitations, General Statutes § 12-415 (f), and provide him with numerous bookkeeping documents, including cash register tapes. During Egbuna's visit, the plaintiff provided him with certain records, including bank statements, a ledger maintained in a QuickBooks software program and daily sales reconciliation reports (daily reports), which were prepared from detailed cash register tapes being utilized on the plaintiff's premises. Those daily reports reflected the day's total sales, and had attached a copy of the cash register "Z tape" or "Z report"[5] that contained the date, the sequence number and the total amount of cash run through the register since the previous Z report, as well as the cumulative total of all receipts that had ever been run through the register. The plaintiff did not, however, retain the detailed cash register tapes, which recorded individual transactions, as he generally discarded them after preparation of the summary Z reports. Egbuna did not ask the plaintiff to retain any detailed cash register tapes after the initial visit on December 20, 2001.

In May, 2004, Egbuna issued a preliminary report covering from October 1, 1999, through December 31, 2002, which noted that, because the plaintiff had failed to keep original source documents such as detailed

---

[5] As a factual matter, we observe at the outset that the phrase "Z report" apparently is subject to multiple definitions, and that the plaintiff considers a Z report to be a summary document. Specifically, Donald Picard, who maintained the plaintiff's cash registers, testified that a Z report is a report generated by a cash register at the conclusion of a workday to indicate the totals of the day's business and clear those totals in preparation for the next day's business, in contrast to his definition of an "X report," which is a subtotal of any business done up to a point in a given day. Cash registers such as the model used by the plaintiff in this case can, however, create more detailed reports that document each transaction by type, price, date and time. Consistent with Picard's testimony, Egbuna testified that Z reports may contain different levels of detail, and that he understands a "complete" Z report to be one that includes that detailed information, rather than just a summary like those provided by the plaintiff.

cash register tapes or guest checks, Egbuna had utilized an alternative method, specifically, the industry standard markup method, to calculate the proper audited gross receipts.[6] After some intervening discussions between Egbuna and the plaintiff concerning the documentation provided and the method used, the audit process subsequently concluded in July, 2005, when the plaintiff refused to sign any additional waivers of the statute of limitations, leading one of the defendant's audit managers to threaten to impose a jeopardy assessment and place a lien on the plaintiff's business and personal property. In August, 2005, the defendant issued a report for the entire audit period utilizing Egbuna's alternative methodology and determined a tax deficiency of $155,536.77, a 25 percent fraud penalty of $38,884.26, plus interest in the amount of $62,322.74, for a total assessed liability of $256,743.77. Shortly thereafter, the defendant issued a jeopardy assessment billing notice and, in December, 2005, served a tax warrant on the plaintiff and recorded a tax lien on his property.

Thereafter, the plaintiff requested a hearing from the defendant, and, on October 25, 2006, the defendant's appellate division relieved the plaintiff of the fraud penalty and remanded the case to Egbuna for further consideration; Egbuna then issued a subsequent report finding a tax deficiency of $94,690.22, along with a 15

[6] Under the industry standard markup method, Egbuna analyzed the amount of food, beer and liquor purchased by the plaintiff, utilized an industry standard measurement to determine how much beer or liquor is contained in a drink in calculating how many drinks can be sold per bottle or keg, and then applied industry standard markups, as well as comparative pricing with similar establishments, to those projected sales to determine the audited gross receipts for purposes of assessing the plaintiff's sales tax compliance. At trial, the plaintiff objected to Egbuna's audit methodology, claiming that it failed to account properly for occurrences such as theft, both by employees and patrons, and the frequent overpouring or dispensation of free drinks by bartenders.

percent negligence penalty of $14,203.52, and interest in the amount of $49,491.45, for a total assessed liability of $158,385.19. Subsequently, in July, 2007, the defendant's appellate division rejected the plaintiff's protest of that latest deficiency assessment.[7]

In August, 2007, the plaintiff appealed from the defendant's decision to the trial court pursuant to General Statutes § 12-422, seeking to have the court set aside the deficiency assessment and "grant such other relief as the court deems appropriate in law and equity." The plaintiff also claimed that the jeopardy assessment was illegal because delay would not have jeopardized the collection of the tax given his standing and ties to the business community, as well as his real property holdings with values that far exceeded the tax deficiency. In its memorandum of decision, the trial court relied on *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 302, 823 A.2d 1184 (2003), and concluded that Egbuna properly had resorted to the industry standard markup method of auditing the plaintiff's business because the plaintiff's sales were unverifiable due to the fact that he had failed to keep the records required by § 12-2-12 (b) (1) of the Regulations of Connecticut State Agencies, namely, the detailed cash register tapes. The trial court further credited Egbuna's testimony that numerous discrepancies in the plaintiff's books could only be resolved by examining the original transactions found on the cash register tapes. Thus, the trial court concluded that the plaintiff's failure to retain the detailed cash register tapes precluded him from meeting his burden of proving that the defendant's assessment was incorrect. The trial court further concluded, however, that it would be equitable to relieve the plaintiff

[7] The defendant's appellate division ordered the plaintiff to pay a total balance due of $162,200.31, representing $94,690.22 in taxes, a penalty of $9496.52 and $58,013.37 in interest; this amount reflected the application of $4707 that the plaintiff had already paid to the defendant in January, 2006.

of the 15 percent negligence penalty, given that Egbuna had failed to advise the plaintiff to retain the detailed cash register tapes for the remainder of the audit period.

The trial court then determined that the defendant had improperly imposed a jeopardy assessment on the plaintiff because the defendant could not have had the "reasonable belief" required by § 12-417 that the jeopardy assessment was necessary, given the removal of the original fraud penalty by the defendant's appellate division and the plaintiff's ample assets and ties to the business community. The trial court noted that the jeopardy assessment had a deleterious effect on the plaintiff's public image and subjected him to immediate collection efforts, such as wage executions and jeopardy of his real and personal property, as well as the requirement that he pay the state marshal's commission of $15,777.92. The court concluded that, "in view of . . . a lack of basis for the [defendant] to believe that the collection process against the plaintiff was in jeopardy of delay or impairment, and the resultant unnecessary expense incurred by the taxpayer for the state marshal's charges and fees, it is a fair and equitable resolution for the plaintiff not to bear the burden of the state marshal's expense of $15,777.92." Thus, the trial court rendered judgment sustaining the plaintiff's appeal in part as to the 15 percent negligence penalty and the state marshal's fee, and denying the appeal as to the total tax due of $94,690.22 plus interest. This appeal followed.

On appeal, the plaintiff claims that the trial court improperly: (1) concluded that his failure to retain the detailed cash register tapes precluded him from successfully challenging the deficiency assessment because the summary Z reports that he provided were not an adequate substitute; and (2) limited the remedy for the illegal jeopardy assessment to eliminating the state marshal's fee. We address each claim in turn.

By way of background, we note, however, that, under the act, "[i]f the [defendant] is not satisfied with the return or returns of the tax or the amount of tax required to be paid to the state by any person, he may compute and assess the amount required to be paid upon the basis of the facts contained in the return or returns or upon the basis of any information within his possession or that may come into the commissioner's possession. . . . Inadequate taxpayer records may be the basis for a prima facie finding that the taxing authority's tax assessment is correct. . . . It is well established that the burden of proving an error in a deficiency assessment is on the plaintiff . . . . The plaintiff must present clear and convincing evidence that the assessment is incorrect or that the method of audit or amount of tax assessed was erroneous or unreasonable. . . . When considering this issue, [b]ecause a tax appeal is heard de novo, a trial court judge is privileged to adopt whatever testimony he reasonably believes to be credible." (Citations omitted; internal quotation marks omitted.) *Leonard* v. *Commissioner of Revenue Services*, supra, 264 Conn. 302.

I

We begin with the plaintiff's claim that the trial court improperly concluded that the summary Z reports were not an appropriate substitute for the detailed cash register tapes, thus permitting the defendant to resort to an alternative auditing method and precluding the plaintiff from carrying his burden of proving that the defendant's assessment was incorrect.[8] Specifically, the plaintiff argues that the Z reports were "cash register tapes" as

---

[8] We note that the plaintiff's brief is far from a model of clarity, and it is difficult to divine his precise claim on appeal. We, like the trial court, understand his claim to be that the Z reports he kept are cash register tapes that satisfy his record keeping responsibilities as a matter of law under § 12-2-12 (b) of the Regulations of Connecticut State Agencies, and will analyze it accordingly.

prescribed by § 12-2-12 (b) (1) of the Regulations of Connecticut State Agencies because they lack only the time that the individual sales transactions took place, and the "only difference between this tape and the original cash register tape is that [the Z report] is the accumulation of all the individual transactions that were on the original tapes." In response, the defendant contends summarily that the trial court properly determined that the plaintiff did not maintain adequate records because of his failure to provide documentation of individual sales. We conclude that the trial court properly determined that the defendant properly resorted to an alternate auditing methodology because the term cash register tapes under § 12-2-12 (b) (1) means the detailed cash register tapes with documentation of individual transactions.

Whether the trial court properly concluded that the plaintiff's records were inadequate, thus supporting its prima facie finding that the defendant's tax assessment was correct, depends on whether summary Z reports are cash register tapes as contemplated by § 12-2-12 (b) (1) of the Regulations of Connecticut State Agencies. This requires us to interpret that regulation, which implements the legislature's directive in § 12-426 (3) (A) that "[e]very seller, every retailer as defined in subparagraph (B) of subdivision (12) of section 12-407 and every person storing, accepting, consuming or otherwise using in this state services or tangible personal property purchased from a retailer shall keep such records, receipts, invoices and other pertinent papers in such form as the commissioner requires." Administrative regulations have the "full force and effect" of statutory law and are interpreted using the same process as statutory construction, namely, under the well established principles of General Statutes § 1-2z. See, e.g., *Hasychak* v. *Zoning Board of Appeals*, 296 Conn. 434, 443, 994 A.2d 1270 (2010); *Rainforest Cafe* v. *Dept.*

*of Revenue Services*, 293 Conn. 363, 375, 977 A.2d 650 (2009). "Moreover, we consider the trial court's decision mindful of certain fundamental principles applicable to the statutory construction of tax statutes. [W]hen the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer. . . . [S]tatutes establishing the procedure for the collection of taxes, including statutes enacted to prevent tax frauds, [however] are given a liberal, rather than strict, construction." (Citations omitted; internal quotation marks omitted.) *Leonard* v. *Commissioner of Revenue Services*, supra, 264 Conn. 295.

Thus, as required by § 1-2z, we begin with the text of § 12-2-12 (b) (1) of the Regulations of Connecticut State Agencies, which provides: "A taxpayer shall maintain all records that are necessary to a determination of correct tax liability under the affected tax law provisions. All required records shall be made available upon request by the commissioner or his authorized representatives as provided for in the affected tax law provisions. Such records include, but are not limited to: books of account, invoices, sales receipts, *cash register tapes*, purchase orders, exemption certificates, returns, and schedules and working papers used in connection with the preparation of returns." (Emphasis added.) Subdivision (2) of the regulation provides further that the "[f]ailure to maintain such records will be considered evidence of negligence or intentional disregard of law or regulation and may, without more, result in the imposition of appropriate penalties." Regs., Conn. State Agencies § 12-2-12 (b) (2). The common usage of the terms in the regulation, and particularly the dictionary definition[9] of the term "cash register," suggests that a

---

[9] See, e.g., General Statutes § 1-1 (a); *Key Air, Inc.* v. *Commissioner of Revenue Services*, 294 Conn. 225, 235, 983 A.2d 1 (2009).

cash register tape would record individual sales, rather than aggregated records. See Merriam-Webster's Collegiate Dictionary (10th Ed. 2001) (defining cash register as "business machine that usu[ally] has a money drawer, *indicates the amount of each sale,* and records the amount of money received and often automatically makes change" [emphasis added]). The term cash register tape is ambiguous, however, because it is undefined and fails to account for the varying kinds of cash register tapes that businesses may keep. See footnote 5 of this opinion. Furthermore, when viewed in context, although subsequent portions of § 12-2-12 appear to require transaction level detail, other documents listed in subsection (b) (1) of § 12-2-12, such as returns, schedules and books of account, suggest more aggregated summaries.

This ambiguity aside, review of the entire regulation strongly suggests that, for auditing purposes, the defendant uses the term cash register tape to mean the original detailed document that records each sale transaction individually, rather than as aggregate summaries. For example, subsection (c) (1) (A) of § 12-2-12 of the Regulations of Connecticut State Agencies provides that "[m]achine-sensible records used to establish tax compliance shall contain *sufficient transaction-level detail* information so that the details underlying the machine-sensible records can be identified and made available to the commissioner upon request. A taxpayer has discretion to discard duplicated records and redundant information provided its responsibilities under this section are met." (Emphasis added.) Indeed, subsection (c) (2) of § 12-2-12 of the Regulations of Connecticut State Agencies, which governs "electronic data interchange processes," provides that "the level of record detail, in combination with other records related to the transactions, shall be equivalent to that contained in an acceptable paper record," and lists the

required data in specific detail, providing that "the retained records should contain such information as vendor name, invoice date, product description, quantity purchased, price, amount of tax, indication of tax status, shipping detail, etc. . . ." Moreover, the defendant directs taxpayers who use database management systems to ensure sales tax compliance "to create and retain a file that contains the *transaction level detail* from the database management system and that meets the requirements of subsection (d). The taxpayer should document the process that created the separate file to show the relationship between that file and the original records." (Emphasis added.) Regs., Conn. State Agencies § 12-2-12 (f) (1). Thus, the regulation in context strongly suggests that an original source document, such as a cash register tape, is adequate if it permits the auditor to examine sales transactions individually.

Moreover, we also find persuasive sister state decisions that have concluded that state sales tax auditors properly resorted to alternative auditing methodology on the ground of inadequate record keeping when the taxpayer was able to provide only summary cash register tapes that lacked individual transaction data. For example, in *Matter of Licata* v. *Chu*, 64 N.Y.2d 873, 874, 476 N.E.2d 997, 487 N.Y.S.2d 552 (1985), the New York Court of Appeals concluded that the "auditor's use of a test period and markup audit to estimate the tax due from [taxpayers] was neither arbitrary nor without rational basis" when the "[taxpayers'] sales tax records have as their source cash register tapes which show only total sales and sales tax collected by categories" since the "auditor could not determine from the tapes available whether tax had been charged on all taxable items and whether the proper tax had been charged in each instance . . . ." Cf. *Matter of Raemart Drugs, Inc.* v. *Wetzler*, 157 App. Div. 2d 22, 24–25, 555 N.Y.S.2d 458 (1990) (summary cash register tapes were adequate

records when cash register used was consistent with standard for drugstore business and there existed "essentially complete" set of other records permitting verification of store's sales). Similarly, in *McDonald's of Springfield, Ohio, Inc.* v. *Kosydar*, 43 Ohio St. 2d 5, 8, 330 N.E.2d 699 (1975) (per curiam), the Ohio Supreme Court concluded that the cash register tapes were inadequate under a record keeping regulation requiring the retention of, inter alia, "cash register tapes," because they "only indicated the total price of each individual sale and the total amount of tax charged. There was no delineation showing what items were considered taxable or nontaxable, and no indication of which sales were for consumption on the premises as opposed to consumption off the premises." See also *National Delicatessens, Inc.* v. *Collins*, 46 Ohio St. 2d 333, 334, 348 N.E.2d 710 (1976) (per curiam) (cash register tapes were "inadequate" under tax regulation when "[they] reveal only daily totals for each of three categories of sales").

Thus, guided by the text of the regulation and the persuasive sister state case law, we conclude that the trial court properly determined that, under § 12-2-12 (b) (1) of the Regulations of Connecticut State Agencies, the plaintiff was required to retain the detailed cash register tapes that documented the individual sale transactions as they occurred, rather than just the summary Z reports aggregating the sales.[10] Accordingly, we further

[10] Moreover, to the extent that the plaintiff claims that the trial court improperly found as a factual matter that the Z reports he had provided did not satisfy the level of detail required by § 12-2-12 (b) (1) of the Regulations of Connecticut State Agencies, we disagree. This conclusion was not clearly erroneous because it was supported by Egbuna's testimony that he could not verify the plaintiff's sales and actual prices charged, or reconcile the discrepancies in the plaintiff's books without documentation of each sale transaction, particularly given the plaintiff's admissions that he had underreported his taxable gross receipts of food and liquor sales on multiple occasions. The plaintiff relied on the testimony of David Picard, who maintained the plaintiff's cash register, in support of the plaintiff's argument that the Z report contained all the information necessary to verify his sales because

conclude that the trial court properly determined that the plaintiff's records were inadequate, thereby supporting its: (1) "prima facie finding that the [defendant's] tax assessment is correct"; and (2) further conclusion that the plaintiff failed to "present clear and convincing evidence that the assessment is incorrect or that the method of audit or amount of tax assessed was erroneous or unreasonable."[11] (Internal quotation marks omitted.) *Leonard* v. *Commissioner of Revenue Services,* supra, 264 Conn. 302.

## II

We next turn to the plaintiff's claim that, after concluding that the defendant had improperly imposed a jeopardy assessment on him, the trial court improperly limited relief to relieving him of liability for the state marshal's fee. Claiming that the "[defendant] should be held to the same high standard as the [defendant] expects from the plaintiff," the plaintiff claims that the "original illegal assessment should be considered void and as if it had never occurred. This result would be both reasonable and equitable and a true deterrent to

the Z report, for example, would merely indicate that key number one on the register, which would correspond to a certain item, was depressed thirty-eight times during a day for a total of $70.55 in sales. Notwithstanding that testimony, however, the trial court reasonably could have credited Egbuna's testimony to the contrary regarding the more detailed nature of Z reports that he had been able to utilize in past audits. See footnote 5 of this opinion.

[11] We agree with the plaintiff that it would have been at the very least preferable for Egbuna to advise him to retain the detailed cash register receipts at the audit's inception in December, 2001, thereby prompting the plaintiff to remain in compliance for the remainder of the audit period. We disagree, however, with the plaintiff's characterization of Egbuna's failure to do so as a "trap" that should influence the outcome of this appeal. Given the plaintiff's much touted experience as a sophisticated businessman, common sense would dictate that an ongoing state audit would have inspired him to keep the most detailed records possible to show his continued compliance with the sales tax laws. Moreover, the trial court redressed any harm occasioned by Egbuna's failure to warn the plaintiff to retain the detailed cash register tapes by sustaining the appeal in part and relieving the plaintiff of the 15 percent negligence penalty that the defendant had imposed.

such future actions." At oral argument before this court, the plaintiff's counsel explained that this cryptically briefed claim means that the trial court improperly failed to order the removal of the $262,965.25 tax lien on his property that the defendant had filed with the Hartford town clerk on December 8, 2005. In response, the defendant's counsel argued orally that she would have filed a tax lien in any case with a deficiency assessment, not just in connection with a jeopardy assessment, and that the tax lien remains valid, although possibly in a lower amount than was originally filed.[12] We decline to reach this claim because, for a myriad of reasons, it is not properly before us.

We begin by noting that the trial court never ruled explicitly on any claim with respect to the disposition of the tax lien in concluding that, as a result of the illegal jeopardy assessment, the plaintiff should be relieved of the burden of paying the state marshal's fees. This likely is attributable to the fact that the plaintiff's tax appeal complaint did not ask specifically for relief from the lien in its prayers for relief,[13] and the plaintiff's posttrial brief sought only to have the entire jeopardy assessment declared "illegal and void," and did not specifically seek an order discharging the lien. Moreover, as he admitted at oral argument before this court, the plaintiff did not file any postjudgment motions for reconsideration or articulation after filing the appeal, or, alternatively, did not file an application for discharge of the lien pursuant

---

[12] The defendant also appears to claim in her brief that the trial court improperly concluded that she impermissibly issued a jeopardy assessment against the plaintiff. We note, however, that the defendant failed to file a cross appeal pursuant to Practice Book § 61-8 from this portion of the trial court's judgment. Accordingly, we decline to consider this claim. See, e.g., *Przekopski* v. *Przekop*, 124 Conn. App. 238, 240 n.2, 4 A.3d 844 (2010).

[13] The plaintiff sought the following relief in his tax appeal complaint: (1) "to set aside the [defendant's] determination of tax, penalties and interest"; and (2) for "such other relief as the court deems appropriate in law and equity."

to General Statutes § 49-51 (a),[14] which would have brought this potential oversight in the judgment to the trial court's attention.[15] Thus, the plaintiff has in effect raised this claim for the first time on appeal, which has "denied the trial court the opportunity to act and correct any potential errors with respect to this issue."[16] *Saunders* v. *Firtel*, 293 Conn. 515, 534 n.20, 978 A.2d 487

[14] General Statutes § 49-51 (a) provides: "Any person having an interest in any real or personal property described in any certificate of lien, which lien is invalid but not discharged of record, may give written notice to the lienor sent to him at his last-known address by registered mail or by certified mail, postage prepaid, return receipt requested, to discharge the lien. Upon receipt of such notice, the lienor shall discharge the lien by sending a release sufficient under section 52-380d, by first class mail, postage prepaid, to the person requesting the discharge. If the lien is not discharged within thirty days of the notice, that person may apply to the Superior Court for such a discharge, and the court may adjudge the validity or invalidity of the lien and may award the plaintiff damages for the failure of the defendant to make discharge upon request. If the court is of the opinion that such certificate of lien was filed without just cause, it may allow, in its discretion, damages to any person aggrieved by such failure to discharge, at the rate of one hundred dollars for each week after the expiration of such thirty days, but not exceeding in the whole the sum of five thousand dollars or an amount equal to the loss sustained by such aggrieved person as a result of such failure to discharge the lien, which loss shall include, but not be limited to, a reasonable attorney's fee, whichever is greater."

[15] At oral argument before this court, the plaintiff represented that, after the trial court rendered judgment in this case, he had approached the defendant and requested removal of the lien, but the defendant declined that request. The plaintiff also acknowledged that he did not pursue further relief from that denial with the trial court. Thus, the plaintiff's reliance at oral argument before this court on *Johnson* v. *United States*, 990 F.2d 41, 43 (2d Cir. 1993), cert. denied, 516 U.S. 880, 116 S. Ct. 213, 133 L. Ed. 2d 144 (1995), for the proposition that discharge is the appropriate relief from an illegally imposed tax lien, is inapposite. *Johnson* was a quiet title action brought for the specific purpose of discharging the lien, so, unlike the present case, there was no doubt therein as to the relief sought.

[16] Indeed, points raised during oral argument before this court make particularly clear that we should not decide this issue without the benefit of the trial court ruling on it in the first instance, including the defendant's counterargument that the lien remains valid as to the postjudgment deficiency amount, and the dispute that emerged with respect to whether the defendant files tax liens in all cases, not just those with jeopardy assessments, prior to the final disposition of any tax appeal.

(2009). Accordingly, we decline to engage in "ambuscade of the trial judge" by considering on appeal the plaintiff's claims with respect to the tax lien.[17] (Internal quotation marks omitted.) *Konigsberg* v. *Board of Aldermen*, 283 Conn. 553, 597 n.24, 930 A.2d 1 (2007).

The judgment is affirmed.

In this opinion the other justices concurred.

---

[17] We also note that the plaintiff's failure to make clear in his brief his desired relief with respect to the lien provides another basis for declining to review this claim, namely, that "claims on appeal must be adequately briefed, and cannot be raised for the first time at oral argument before the reviewing court." See, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).