# UNIVERSITY OF CONNECTICUT *v.* FREEDOM OF INFORMATION COMMISSION ET AL.
## (SC 18772)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Harper, Js.

Argued December 5, 2011—officially released February 21, 2012

*Clifton A. Leonhardt,* with whom, on the brief, were *Gregory F. Daniels,* commission counsel, and *Colleen M. Murphy,* general counsel, for the appellant (named defendant).

*Michael Sullivan,* assistant attorney general, with whom, on the brief, were *George Jepsen,* attorney general, and *Henry Salton,* assistant attorney general, for the appellee (plaintiff).

*Opinion*

HARPER, J. This appeal concerns the issue of whether a public agency can create and maintain trade secrets that are exempt from disclosure under General Statutes § 1-210 (b) (5) (A)[1] of the Freedom of Information Act (act), General Statutes § 1-200 et seq. The named defendant, the freedom of information commission (commission), appeals[2] from the trial court's judgment sustaining the administrative appeal of the plaintiff, the University of Connecticut (university), from the commission's decision ordering the university to disclose databases identifying persons who had paid to attend, donated to, inquired about or participated in certain educational, cultural or athletic activities of institutions within the university. The commission contends that, in light of the public policy favoring disclosure of public records, the trial court improperly rejected the commission's determination that none of the databases at issue could be trade secrets because the university is not principally engaged in a trade.[3] We affirm the trial court's judgment.

[1] The full text of this provision is set forth later in this opinion.

[2] The commission appealed from the trial court's judgment to the Appellate Court, and we thereafter transferred the appeal to this court. See General Statutes § 51-199 (c); Practice Book § 65-1.

[3] As we explain later; see footnote 6 of this opinion; the commission asserted an additional claim before this court that we do not reach in this appeal.

The record reflects the following undisputed facts. In April, 2008, the defendant Jonathan Pelto submitted a freedom of information request to the university seeking disclosure of eleven databases that Pelto believed institutions within the university were maintaining. The information sought by Pelto included the names, street addresses, telephone numbers and e-mail addresses of individuals from the following four university databases that are the subject of this appeal: the athletics department's database of season ticket purchasers;[4] Jorgensen Auditorium's database of subscribers, individual event ticket buyers and prospects; the Center for Continuing Studies' (center) database of persons having an interest in its programs and course offerings; and the library's database of donors and friends. Pelto purported to seek this information on behalf of a group of university alumni and friends for the purpose of creating an advocacy organization to help persuade legislators, public officials and the university's board of trustees to provide the university with proper support. The university declined to provide Pelto with the four databases, asserting that all of them are exempt from disclosure under § 1-210 (b) (5) (A) as trade secrets in the form of customer lists and that the center's database also is exempt under § 1-210 (b) (11) and (17) "as contact and/or other information related to students . . . ."

Thereafter, Pelto filed a complaint with the commission, contending that the university's failure to disclose the information violated the act. At a hearing on the matter, Pelto acknowledged that he owns a public relations company that, inter alia, develops mailing databases for its clients, which include an Indian casino, nonprofit organizations and political leaders, but denied

---

[4] Pelto also sought a list of individual game ticket purchasers, but the commission found that the university does not maintain records of such purchases.

seeking the university's databases to further the interests of his clients.[5]

In its final decision, the commission concluded that, with a limited exception, the university had violated the act by failing to disclose the databases. In rejecting the university's claim that the databases are customer lists protected by the act's trade secret exemption, the commission first noted that it previously had not determined whether that exemption applies to a public agency's own trade secrets, rather than only to a private entity's trade secrets submitted or filed with such an agency. Turning to that question as applied specifically to the university, the commission found that the databases contained information consistent with the definition of trade secrets in that they could be of economic value to others and that the university maintained them in such a way as to avoid disclosure. Nonetheless, it concluded that the university could not assert the act's trade secret exemption because none of the databases were maintained by an entity engaged in a trade. Specifically, the commission reasoned that public agencies are generally engaged in governance, not trade. It noted that the principal function of the university was education, a traditional government function. With respect to the databases of the athletics department and Jorgensen Auditorium relating to the marketing and selling of tickets for events, the commission found that, "unlike a private business entity engaged in 'trade' where profits are closely linked to such entities' existence and economic advantage, the cultural and athletic activities of the [university] are incidental to its primary governmental function of education. . . . [The university] is

---

[5] As the trial court properly noted, disclosure under the act does not turn on the motive for the request. Nonetheless, we agree with the university that the question of whether Pelto, or other persons similarly situated, could obtain economic value from the disclosure would be relevant in assessing whether the information constitutes a trade secret.

largely subsidized by public funding, unlike a private business engaged in a trade that depends on earned income for its continued existence." With respect to the library's database, the commission found that, "[w]hile the patronage of . . . donors often provides financial assistance to the programs and projects of the library, the [c]ommission is not persuaded that the library is engaged in trade with such donors . . . ." The commission nevertheless concluded that it would exercise its discretion and not compel the library to disclose the names of those persons who had requested anonymity in exchange for their donations. With respect to the center's database, the commission similarly found that the center's mission of providing education was not a trade, and, therefore, this database also did not contain trade secrets. The commission did, however, agree with the university insofar as whatever information in the center's database that would personally identify students was protected under the education records exemption under § 1-210 (b) (17). In accordance with the foregoing reasoning, the commission ordered the university to disclose to Pelto all of the information he had sought, with the limited exceptions identified for anonymous library donors and education records.

The university appealed from the commission's decision to the Superior Court pursuant to General Statutes §§ 1-206 (d) and 4-183 (i), and the court sustained the appeal. The court first answered in the affirmative the question of whether the university could, as a matter of law, create a trade secret entitled to the exemption under the act. The court rejected the commission's determination that the exemption's application turns on whether the public agency is engaged in a trade and instead concluded that the exemption's application turns on whether the government has engaged in activities that create qualifying intellectual property. With

respect to customer lists as a type of trade secret under § 1-210 (b) (5) (A), the court reasoned that a governmental entity that sells things would have customers, as that term commonly is understood.

In light of its conclusion that the university could create a trade secret customer list, the court considered evidence presented to the commission regarding each database to determine whether it met the statutory definition of a trade secret under the act. The court examined the nature of the information in the databases, the purposes for which such information was used, whether there were potential competitors with respect to such purposes, and the economic benefit that such information might confer on competitors. Ultimately, the court concluded that the evidence established that the databases for the athletics department, Jorgensen Auditorium and the center met the criteria for customer list trade secrets. With respect to the library database, the court rejected the reason stated in the commission's decision for concluding that the trade secret exemption was inapplicable—that the library was not engaged in a trade—but nonetheless agreed with the commission's ultimate conclusion under the reasoning that this database is not a customer list because the library's donors and friends are not customers. Although the court determined that this database might fall into the broader class of trade secret "information," it questioned whether this database satisfied one requirement of trade secrets generally—that the information was "not being generally known to, and not being readily ascertainable by proper means by, other persons . . . ." General Statutes § 1-210 (b) (5) (A). In the absence of any findings by the commission as to this issue, the court concluded that it should remand the matter back to the commission for further determinations as to this issue and "any other related points that might be raised on remand." This appeal followed.

At the outset, it is necessary to make clear what claims properly are before us in light of changes in the commission's position since it filed its appellate brief. At oral argument before this court, the commission disavowed the sweeping position that it had advanced both before the trial court and in its appellate brief, namely, that public agencies cannot create trade secrets protected from disclosure under the act. Instead, it advanced the slightly narrower position that it had stated in its decision—that, in light of the policies favoring disclosure underlying the act, the trade secrets exemption must be construed to apply to public agencies only when they are engaged in a trade. The commission conceded that the athletics department's database of season ticket holders satisfied this requirement, but argued that the other databases did not. The commission also contended that the trial court's judgment should be reversed on the ground that the university had failed to produce evidence to the commission to establish an essential element of a trade secret—that the information was "not being readily ascertainable by proper means by . . . other persons . . . ." General Statutes § 1-210 (b) (5) (A).

Upon questioning from this court, however, the commission conceded that there was nothing in the record to indicate that it had asserted its evidentiary claim before the trial court. The commission's appellate brief also does not advance this claim; the only statements remotely bearing on this issue are generalized assertions that a plaintiff bears the burden of proving entitlement to an exemption. Accordingly, the commission is not entitled to review of its evidentiary claim in light of the settled principle of waiver, as well as this court's policy not to consider arguments inadequately briefed and raised substantively for the first time at oral argument. See *Alexandre* v. *Commissioner of Revenue Services*, 300 Conn. 566, 585, 586 n.17, 22 A.3d 518 (2011).

We therefore turn to the sole issue in the commission's appeal properly before us. Specifically, we consider whether a public agency that creates and maintains information that would constitute a trade secret if created by a private entity must engage in a "trade" in order to shield such information from disclosure under the act. We answer that question in the negative.[6]

---

[6] We note that the commission's appellate brief also asserts a claim that the trial court improperly expanded the issues in the case by considering whether the library database is trade secret information after agreeing with the commission that the database is not a trade secret customer list. It is unclear from representations that the commission made at oral argument before this court regarding the claims that it intends to advance whether it has abandoned this claim. Nevertheless, we note that the only case that the commission cited in support of this position is an Appellate Court case wherein the trial court had addressed a distinct exemption from the one considered by the commission. See *Hartford* v. *Freedom of Information Commission*, 41 Conn. App. 67, 73, 674 A.2d 462 (1996) ("The trial court needlessly enlarged the issue on appeal by analyzing the question of whether the relevant records are engineering documents, an argument not found in the record. In doing so, the court seemingly ignored the city's argument that the records were exempt because they were feasibility estimates."). In the exemption at issue in the present case, a customer list is not a distinct category, but a description of a type of "information" that can be a trade secret. See General Statutes § 1-210 (b) (5) (A) (exempting "[t]rade secrets, which for purposes of the Freedom of Information Act, *are defined as information, including* formulas, patterns, compilations, programs, devices, methods, techniques, processes, drawings, cost data, *customer lists*, film or television scripts or detailed production budgets that [meet specified criteria]" [emphasis added]). Thus, the Appellate Court case is distinguishable. More fundamentally, it is ironic that the commission asserts this argument, given that the trial court reached this issue only after rejecting the sole ground stated in the commission's decision for concluding that the library database was not a trade secret customer list and then sua sponte raising the issue of whether the database lacked the requisite customers.

We also note that, in light of our conclusion affirming the trial court's judgment, we need not address an argument asserted in the university's brief that the commission's decision was arbitrary and capricious. We further note, however, that the university did not file a preliminary statement of alternative grounds for affirmance; see Practice Book § 84-11; nor did it file a cross appeal from the trial court's decision insofar as it remanded the matter to the commission for further proceedings regarding the library database.

The present appeal turns on the scope and meaning of the definition of a trade secret under the act. "It is well established that an administrative agency's decision under the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., with respect to the construction of a statute is not entitled to special deference when [as in the present case] that determination has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . . Instead, [w]ell settled principles of statutory interpretation govern our review." (Citation omitted; internal quotation marks omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, 301 Conn. 323, 336–38, 21 A.3d 737 (2011). Under those principles, "we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) Id., 338. The sources to which we may look to make this determination are limited by the legislature's plain meaning rule. See General Statutes § 1-2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.").

The university is a public agency within the meaning of § 1-200 (1) and is, therefore, required under the act to disclose public records unless disclosure is otherwise limited or prohibited by law. The disclosure exception at issue provides in relevant part: "Nothing in the Freedom of Information Act shall be construed to require disclosure of . . . (5) (A) Trade secrets, which for purposes of the Freedom of Information Act, are defined

as information, including formulas, patterns, compilations, programs, devices, methods, techniques, processes, drawings, cost data, customer lists, film or television scripts or detailed production budgets that (i) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and (ii) are the subject of efforts that are reasonable under the circumstances to maintain secrecy . . . ." General Statutes § 1-210 (b).

This definition, on its face, focuses exclusively on the nature and accessibility of the information, not on the status or characteristics of the entity creating and maintaining that information. More particularly, there is no requirement, express or implied, that the entity generally must be engaged in a "trade," however one might define that term. In the absence of any such limitation, it is self-evident that there cannot be any basis to apply that limitation to public, but not private, entities. If the information meets the statutory criteria, it is a trade secret and the entity creating that information would be engaged in a trade for purposes of the act even if it was not so engaged for all purposes. Accordingly, nothing in the act indicates an intention to exclude public agencies from the exemption to disclosure for trade secrets they have created if the agencies generally do not engage in a "trade."

Related statutes further confirm this interpretation. The definition of a trade secret under § 1-210 (b) (5) (A) mirrors the definition under Connecticut's Uniform Trade Secrets Act (trade secrets act), General Statutes §§ 35-50 through 35-58, which penalizes the misappropriation of trade secrets. See General Statutes § 35-51.[7]

---

[7] General Statutes § 35-51 provides in relevant part: "As used in this chapter, unless the context requires otherwise . . . .

"(b) 'Misappropriation' means: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was

Significantly, that act expressly applies to both public and private entities and clearly does not impose any requirement that either type of entity principally be engaged in a trade. See General Statutes § 35-51 (c) (defining " '[p]erson' " under trade secret act expansively as "a natural person, corporation, limited liability company, business trust, estate, trust, partnership, association, joint venture, *government, governmental subdivision or agency, or any other legal* or commercial *entity*" [emphasis added]). Although the trade secret act provides that its definition applies "[n]otwithstanding the provisions of sections 1-210 [and certain other statutes]"; General Statutes § 35-51 (d); we can infer two reasonable interpretations of this proviso, neither of which indicate an intention to provide more limited protections to public agencies that are not principally engaged in a trade. First, this proviso may be intended to make clear that the commission is not divested of jurisdiction to decide whether information

---

acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. . . .

"(d) Notwithstanding the provisions of sections 1-210, 31-40j to 31-40p, inclusive, and subsection (c) of section 12-62, '*trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*" (Emphasis added.)

is subject to disclosure, or an exemption to disclosure, under the act. Second, this proviso simply may be an outdated reflection of a time when the act used a different definition of trade secrets; see General Statutes (Rev. to 1999) § 1-210 (b) (5); as the trade secrets act has not been amended since the definition of trade secret under § 1-210 (b) was changed to conform with the definition under § 35-51 (d).[8] See Public Acts 2000, No. 00-136, § 2. Perhaps most fundamentally, it makes no sense to construe the scope of the two acts differently. Once information is ordered disclosed under the Freedom of Information Act, it no longer meets the secrecy requirements of a trade secret and no subsequent use can be a proper basis for a claim of misappropriation. See General Statutes § 35-51 (d). In effect, the protection to government trade secrets would be rendered a nullity.

Such a result could not have been intended. The university exemplifies a prime example of why that is so. It cannot reasonably be questioned that the university expends considerable resources of the state, on its own or in partnership with others, for the research and development of intellectual property. The state's ability to recoup costs or reap the financial benefits for such efforts would be seriously undermined if any member of the public could obtain such information simply by filing a request under the act. Indeed, the legislature has created a statutory scheme to recognize and facilitate the university's ownership of, and control over, information relating to research and development of

[8] Prior to the 2000 amendment; Public Acts 2000, No. 00-136, § 2; trade secrets were defined under the act as "unpatented, secret, commercially valuable plans, appliances, formulas or processes, which are used for the making, preparing, compounding, treating or processing of articles or materials which are trade commodities obtained from a person and which are recognized by law as confidential, and commercial or financial information given in confidence, not required by statute . . . ." General Statutes (Rev. to 1999) § 1-210 (b) (5).

various products, formulas and technologies. See General Statutes §§ 10a-110 through 10a-110g; see also General Statutes § 4-61a (ownership rights of state with respect to inventions and discoveries by state employees).

In sum, all of the textual evidence unambiguously demonstrates the legislature's intention to afford trade secret protection to the university under the act, as long as the information meets the statutory criteria for a trade secret. Although the act embodies a public policy in favor of disclosure, that presumption is subject to clear limits within which the university may claim an exemption.

The judgment is affirmed.

In this opinion the other justices concurred.