******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ALLCO RENEWABLE ENERGY LIMITED ET AL. *v.*
# FREEDOM OF INFORMATION
# COMMISSION ET AL.
## (AC 42992)

Bright, C. J., and Elgo and Alexander, Js.

*Syllabus*

The plaintiffs, a solar development company and its principal, appealed to
this court from the judgment of the trial court dismissing their appeal
from the final decision of the defendant Freedom of Information Com-
mission. The plaintiffs requested certain records from the defendant
Department of Energy and Environmental Protection relating to its
request for proposals issued to solicit offers from developers for large-
scale clean energy contracts. The RFP indicated that each bidder was
to submit a public version of its proposal, with any confidential business
information redacted, as well as an unredacted version of the proposal
that identified all confidential and proprietary information. The RFP
informed bidders that the department would disclose certain information
in its final determination but that it would take reasonable steps to
protect confidential information. The department retained independent
consultants to evaluate the costs and benefits of the proposals submitted
using a market simulation model. The result of the analysis was an
answer key that compiled the data submitted by the bidders, including
confidential, proprietary information. The department denied the plain-
tiffs' request for the release of the answer key, stating that it was a trade
secret exempt from disclosure requirements pursuant to the applicable
provision (§ 1-210 (b) (5)) of the Freedom of Information Act (§ 1-200
et seq.). The plaintiffs appealed from the department's denial to the
commission, which, following a hearing, denied the appeal. The plaintiffs
then appealed to the trial court, which affirmed the decision of the
commission, and the plaintiffs appealed to this court. *Held*:

1. The trial court properly determined that the commission's conclusion
that the answer key met the trade secret criteria set forth in § 1-210
(b) (5) (A) (i) was supported by substantial evidence: the department
engaged in trade by coordinating the RFP and using the answer key to
analyze the proposals, as the process required making a significant
investment within a highly competitive industry for the benefit of rate-
payers across the state; moreover, even though the department did not
have any direct competitors in the renewable energy industry, it was a
participant with a direct interest in ensuring competitive rates because
it had a statutory duty to obtain value for ratepayers; furthermore, there
was sufficient evidence to find that the answer key held economic value
to the department based on the resources expended to develop it, its
value to the market, and the significance of the resulting projects to
ratepayers, and that the answer key's value derived from its secrecy,
as its confidentiality was required to maintain the integrity of the state's
procurement process.

2. The trial court properly determined that the commission's conclusion
that the bidders and the department intended for the information submit-
ted to be given and maintained as confidential information in accordance
with § 1-210 (b) (5) (A) (ii) and (B) was supported by substantial evi-
dence: the commission's determination that reasonable efforts were
made to maintain the secrecy of the information was supported by
testimony given at the commission hearing indicating that nondisclosure
agreements were made, that bidders relied on the department's guaran-
tees of confidentiality, and that certain bidders pursued protective orders
with respect to the information; moreover, based on the testimony at
the hearing, there was substantial evidence to support the conclusion
that the information was "given in confidence" in accordance with § 1-
210 (b) (5) (B) because, although the RFP stated that the department
intended to disclose certain bid information in its final determination,
the department gave express assurances of, and the bidders had resulting
expectations of, confidentiality with respect to a majority of the informa-

tion.

Argued November 19, 2020—officially released June 8, 2021

*Procedural History*

Appeal from the decision of the named defendant dismissing the plaintiffs' complaint regarding a records request submitted to the defendant Department of Energy and Environmental Protection, brought to the Superior Court in the judicial district of New Britain, where the court, *Huddleston, J.*, rendered judgment dismissing the appeal, from which the plaintiffs appealed to this court. *Affirmed.*

*Michael Melone*, for the appellants, with whom, on the brief, was *Thomas Melone*, self-represented, the appellant (plaintiffs).

*Paula S. Pearlman*, commission counsel, for the appellee (named defendant).

*Robert Snook*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Clare Kindall*, solicitor general, for the appellee (defendant Department of Energy and Environmental Protection).

*Opinion*

ELGO, J. The plaintiffs, Allco Renewable Energy Limited (Allco) and its principal Thomas Melone, appeal from the judgment of the Superior Court dismissing their appeal from the final decision of the defendant Freedom of Information Commission (commission), in which the court concluded that the commission properly dismissed the plaintiffs' request for certain documents of the codefendant Department of Energy and Environmental Protection (department).[1] On appeal, the plaintiffs claim that the court improperly concluded that the commission correctly applied General Statutes § 1-210 (b) (5) (A) and (B) of the Freedom of Information Act (act), General Statutes § 1-200 et seq. We affirm the judgment of the Superior Court.

The following undisputed facts, which were found by the commission, are relevant to this appeal. On November 12, 2015, the department issued a request for proposals (RFP), pursuant to No. 13-303 of the 2013 Public Acts and No. 15-107 of the 2015 Public Acts.[2] The RFP, issued in coordination with officials from Massachusetts and Rhode Island for the purpose of meeting clean energy goals in a cost-effective manner, sought to solicit offers from developers for large-scale clean energy contracts. Parties in each state then would "select the project(s) that is/are most beneficial to its customers and consistent with its particular Procurement Statutes. Consequently, evaluation and selection [would] involve an iterative process by which, after an initial threshold examination followed by a quantitative analysis of the bids, the parties from each state [would] review and rank bids based on the qualitative requirements of their respective state."

The RFP also established an "Evaluation Team" (team), comprised of "the soliciting parties, electric distribution companies (EDCs)[3] . . . the Connecticut Procurement Manager, the Connecticut Office of Consumer Counsel, the Connecticut Attorney General and the Massachusetts Department of Energy Resources, who evaluated and ranked the bids." (Footnote added.) The team retained independent consultants, most notably Levitan & Associates, Inc. (Levitan), to aid its evaluation and solicited input from ISO New England, Inc., a federally regulated grid operator for the New England region. The RFP informed bidders that the department would disclose certain information in its final determination and would take reasonable steps where necessary to protect confidential information. Representatives of utility companies on the team signed an agreement known as the "Utility Standard of Conduct," which prohibited discussion of the RFP between EDC personnel on the team and EDC personnel involved in bid preparation.

Various companies submitted a total of thirty-one

proposals. After receiving the bids,[4] the department selected nine projects in Connecticut, including two proposed by the wind power development companies Antrim Wind Energy, LLC (Antrim), and Cassadaga Wind, LLC (Cassadaga). Accordingly, the department notified the EDCs and directed them to negotiate contracts with the nine selected projects. Six of the project proposals, including Cassadaga's proposal, resulted in agreed upon, long-term contracts with the state of Connecticut. These projects were then subject to regulatory review by the Public Utilities Regulatory Authority (PURA) and were approved on September 13, 2017.

Allco is a solar development company that competes in the market at issue and had submitted unsuccessful bids in several other renewable energy procurements by the department in the past. On December 1, 2016, the plaintiffs submitted a freedom of information request via e-mail to the department. In that request, the plaintiffs sought disclosure of responses to the RFP made by several bidders, including Antrim and Cassadaga, as well as "any record or file made by the [department] in connection with the contract award process." The department denied the request in an e-mail sent on January 17, 2017. In that response, the department stated in relevant part that it "does not have any records to produce in response to this request because they are exempt from disclosure under the [act] . . . §§ 1-210 (b) (24), 1-210 (b) (4), and 1-210 (b) (5)."[5]

The plaintiffs appealed from the department's denial to the commission on February 16, 2017. The commission held a contested hearing, in which Antrim and Cassadaga intervened, on October 16, November 9 and November 17, 2017. At the hearing, the department provided the plaintiffs with a compact disc containing unredacted copies of documents that did not fall within the relied on exemptions. The plaintiffs narrowed the scope of their request to records concerning the Antrim and Cassadaga proposals, as well as the content of a document known as the "Levitan Answer Key" (answer key). At the time of this appeal, only the disclosure of the answer key remains at issue.

Following the hearing, the commission reviewed unredacted copies of the disputed records in camera. The commission then issued a written decision in which it found that the answer key was "in its entirety . . . of the kind included in the nonexhaustive list contained in [§ 1-210 (b) (5) (A)]. . . . It is found that the [a]nswer [k]ey (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that were reasonable under the circumstances to maintain secrecy." (Citation omitted; internal quotation marks omitted.) The commission, therefore, denied the plain-

tiffs' appeal with respect to the answer key. From that decision, the plaintiffs appealed to the Superior Court. In a detailed memorandum of decision dated March 18, 2019, the court affirmed the decision of the commission, and this appeal followed.

On appeal, the plaintiffs claim that the court improperly concluded that the commission correctly determined that (1) the answer key qualified as a "trade secret" within the ambit of § 1-210 (b) (5) (A) and (2) the information in the answer key was both given and kept in secrecy in accordance with § 1-210 (b) (5) (A) and (B). In response, the department argues that the information in the answer key fully satisfies the definition of a "trade secret" and that it was subject to strict confidentiality. We agree with the department.

We begin by setting forth the relevant legal principles and applicable standard of review. "It is well established that [j]udicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act [(UAPA), General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . .

"Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a [public] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716, 6 A.3d 763 (2010). "This court is required to defer to the subordinate facts found by the commission, if there is substantial evidence to support those findings." (Internal quotation marks omitted.) *Dept. of Public Utilities* v. *Freedom of Information Commission*, 55 Conn. App. 527, 531, 739 A.2d 328 (1999). "Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence

standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . . The burden is on the [plaintiffs] to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record." (Internal quotation marks omitted.) *Sams* v. *Dept. of Environmental Protection*, 308 Conn. 359, 374, 63 A.3d 953 (2013).

The department is a public agency within the meaning of General Statutes § 1-200 (1). Public agencies "within the meaning of § 1-200 (1) . . . [are] . . . required under the act to disclose public records unless disclosure is otherwise limited or prohibited by law."[6] *University of Connecticut* v. *Freedom of Information Commission*, 303 Conn. 724, 733, 36 A.3d 663 (2012) (*UConn*); see also *Maher* v. *Freedom of Information Commission*, 192 Conn. 310, 314–15, 472 A.2d 321 (1984) ("[s]ince . . . the [agency at issue here] is a [public] agency for purposes of the [act], [it] is bound . . . to maintain its records as public records available for public inspection unless these records fall within one of the statutory exemptions to disclosure").

The act sets forth several exemptions that "reflect a legislative intention to balance the public's right to know what its agencies are doing, with the governmental and private needs for confidentiality. . . . [I]t is this balance of the governmental and private needs for confidentiality with the public right to know that must govern the interpretation and application of the [act]. The general rule, under the act, however, is disclosure. . . . Exceptions to that rule will be narrowly construed in light of the underlying purpose of the act . . . and the burden of proving the applicability of an exemption rests upon the agency claiming it." (Internal quotation marks omitted.) *Maher* v. *Freedom of Information Commission*, supra, 192 Conn. 315. "[D]isclosure under the act does not turn on the motive for the request. Nonetheless . . . the question of whether . . . persons . . . could obtain economic value from the disclosure would be relevant in assessing whether the information constitutes a trade secret." *UConn*, supra, 303 Conn. 728 n.5.

Section 1-210 provides in relevant part: "(b) Nothing in the [act] shall be construed to require disclosure of . . . (5) (A) Trade secrets, which for purposes of the [act], are defined as information, including formulas, patterns, compilations, programs, devices, methods, techniques, processes, drawings, cost data, customer lists, film or television scripts or detailed production

budgets that (i) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and (ii) are the subject of efforts that are reasonable under the circumstances to maintain secrecy . . . ." The trade secret exemption codified in § 1-210 (b) (5) (A) analyzes "the nature and accessibility of the information, not . . . the status or characteristics of the entity creating and maintaining that information." *UConn*, supra, 303 Conn. 734. "[T]o constitute a trade secret, information must be of the kind included in the nonexhaustive list contained in the statute." *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 70, 752 A.2d 1037 (1999). "[T]o qualify for a trade secret exemption . . . [a] substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means." (Internal quotation marks omitted.) *Director, Dept. of Information Technology* v. *Freedom of Information Commission*, 274 Conn. 179, 194, 874 A.2d 785 (2005) (*Director*).

Our Supreme Court previously construed the term "trade secret" in *Town & Country House & Homes Service, Inc.* v. *Evans*, 150 Conn. 314, 318–20, 189 A.2d 390 (1963) (*Town & Country*). In that case, relying on the commentary to § 757 of the Restatement of Torts, the court stated that "[s]ome of the factors to be considered in determining whether given information is a trade secret are (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Town & Country*, supra, 319; see 4 Restatement, Torts § 757, comment (b), p. 6 (1939).

This court has referenced the definition of trade secrets set forth in *Town & Country* when applying the trade secret exemption under the act. See *Dept. of Public Utilities* v. *Freedom of Information Commission*, supra, 55 Conn. App. 531–32. At its core, "[t]he basis for the protection of trade secrets is that the recipient obtains through a confidential relationship something he did not know previously." *Allen Mfg. Co.* v. *Loika*, 145 Conn. 509, 517, 144 A.2d 306 (1958). "The question of whether information sought to be protected . . . rises to the level of a trade secret is one of fact for the trial court." (Internal quotation marks omitted.) *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 68.

I

The plaintiffs first claim that the court improperly concluded that the commission correctly determined that the answer key at issue was exempt pursuant to § 1-210 (b) (5) (A). They argue that, under § 1-210 (b) (5) (A) (i), the answer key cannot be a trade secret in light of our Supreme Court's decision in *UConn* because the department did not engage in "trade." We do not agree.

The following additional facts were found by the commission. Connecticut, Massachusetts, and Rhode Island coordinated to issue requests for proposals. The goal of each state's RFP was to procure renewable energy contracts so as to help meet clean energy goals in a manner that would provide savings for ratepayers. The team constituted a collaboration between a number of prominent parties including, among others, the department, the EDCs, several Connecticut agencies, and the Massachusetts Department of Energy Resources. It also solicited input from independent contractors, most notably Levitan, and the regional grid operator, ISO New England, Inc. The department invested "significant resources" in organizing the RFP, disbursing $330,000 for the contract with Levitan and dedicating hundreds of work hours to the procurement process.

The commission found that the renewable energy industry was highly competitive and that the information at issue was "highly market sensitive and unique to the particular RFP proposals." After it was retained by the department, Levitan evaluated the costs and benefits of bids using a market simulation model known as "Aurora." The result of this analysis constituted the answer key, which the department asserted was "a compilation of extraordinarily complicated data, huge amounts of data and includes . . . confidential proprietary information submitted by all bidders, and cannot be replicated." (Internal quotation marks omitted.) The department argued before the commission that the confidentiality of the answer key was "essential to maintaining the integrity of the state's procurement process, confidence of prospective bidders in future RFPs, and quality and competitiveness of the bids received." The department also asserted that future RFPs would be impacted because bidders could discern confidential information from the answer key that would provide them with an advantage.[7] Moreover, the department contended that disclosure would not only chill future bids, but also impair the ability of participating states to meet their goals because bidders would be able to adjust their proposals to gain a competitive advantage. In particular, the department cited the "millions of Connecticut ratepayer dollars" at risk if the answer key were to be mishandled and testified that the RFP's projected savings amounted to approximately $330 million.

In its written decision, the commission found that

the answer key contained "highly market sensitive" information and derived independent economic value from its secrecy and, accordingly, that it is a trade secret exempt from disclosure under § 1-210 (b) (5) (A). On appeal, the Superior Court upheld the commission's findings, noting that, "[a]s several witnesses testified at the hearing, the market for clean energy is intensely competitive. Development costs are high and the availability of opportunities to contract with utilities for the sale of electricity are very limited. The RFP required developers to provide highly sensitive commercial information, including operational and financial information that were closely guarded by the developers." Regarding the answer key, the court noted: "According to the department's witnesses, the . . . answer key itself is the output of an extensive and complicated computer modeling of energy production for every hour of twenty years, calculated for each of the projects proposed in response to the RFP. The input that went into the modeling included the confidential information provided by developers. . . . The output itself—that is, the four page spreadsheet for which the department asserted the trade secret exemption—discloses the final ranking of the projects, information about the costs and benefits of each proposal, and . . . scores for each project. A person knowledgeable about the industry could use the information presented in the . . . answer key to back out other information that would reveal confidential pricing information . . . ." The court also noted the department's concern that disclosure of the answer key would reveal not only confidential developer information but also sensitive information about the department's own analyses. Analyzing the information in the answer key under the *Town & Country* test and the evidence on the record, the court concluded that "the information in the [answer key] is evidence of the kind identified in § 1-210 (b) (5) (A)."

On appeal, the plaintiffs now argue that the department cannot claim trade secret protection for the answer key because it did not "engag[e] in trade" by conducting the RFP. In *UConn*, supra, 303 Conn. 727, on which the plaintiffs principally rely, an alumni group sought disclosure of various databases containing the information of donors, subscribers, and ticket buyers. The court held that the definition of trade secret under §1-210 (b) (5) (A), on its face, "focuses exclusively on the nature and accessibility of the information"; id., 734; rejecting the commission's argument that the university, as a public agency, could not claim trade secret protection because it "is not principally engaged in a trade." Id., 726. *UConn* establishes that a public agency may hold a trade secret regardless of whether it regularly engages in trade, so long as the nature and accessibility of the document at issue qualifies it as a trade secret. Id., 734. In distinguishing *UConn* from the present case, the plaintiffs contrast the conduct of the uni-

versity in "marketing and selling" school event tickets with the department's conduct as a "regulator." They assert that the nature of the information must include being used in a trade, stating: "If there is no trade, there is no trade secret." They argue that extending the exemption to the answer key would effectively read the word "trade" out of the term "trade secret" because the department did not engage in trade when it promulgated and administered the RFP.

To assess the plaintiffs' claim, we begin with the language of the act. In defining a trade secret for the purposes of the act, § 1-210 (b) (5) (A) highlights economic value and secrecy as the two determinative factors.[8] "Trade secret" is a legal term of art. "If the information meets the statutory criteria, it is a trade secret . . . ." *UConn*, supra, 303 Conn. 734. The term is defined in § 1-210 (b) (5) (A) (i) as deriving "independent economic value, actual or potential, from not being generally known to . . . other persons who can obtain economic value from [its] disclosure or use." If information qualifies as a trade secret under the statutory criteria, it is then also true that "*the entity creating that information would be engaged in a trade for purposes of the act* even if it was not so engaged for all purposes." (Emphasis added.) *UConn*, supra, 734. Furthermore, as the trial court noted, in accordance with the holding of *UConn*, "to address the nature of the information at issue, the analysis must consider the competitive nature of the industry involved . . . ."

The inquiry necessarily considers the extent to which the economic value of the thing being assessed inheres in the secrecy by which it is developed and maintained.[9] A "substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means." (Internal quotation marks omitted.) *Director*, supra, 274 Conn. 194. Beyond that, "[i]t is not possible to state precise criteria for determining the existence of a trade secret. The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information . . . ."[10] Restatement (Third), Unfair Competition § 39, comment (d), p. 430 (1995). Our review of the record reveals that the nature of the information in the answer key inherently relates to trade and that its value is a function of the secrecy involved in both its development and use.

First, the department fundamentally engaged in commerce in this case. General Statutes § 22a-2d charges the department with fulfilling goals for the purposes of energy policy and regulation, which include ratepayer cost maintenance.[11] The commission found that the RFP was a multistate effort to meet clean energy goals and achieve cost savings for ratepayers. It further found that the renewable energy procurement process is highly

competitive and that the department "invested significant resources . . . including . . . $330,000 on the contract with Levitan," with the expectation of significant ratepayer savings in the amount of $330 million. Although "the primary economic value identified" accrued to the ratepayers, the department played a key role in generating that value. The court described the department as acting "at least in part as a procurement agent" for the EDCs. Accordingly, this case features a state entity that, as a commercial actor, has made a significant investment within a heavily competitive industry for the benefit of ratepayers across the state. Therefore, like the state treasurer who analyzes investments for the benefit of the state, here the department engages in trade by coordinating the RFP and using the answer key to analyze multimillion dollar proposals to benefit the state and its ratepayers.

The plaintiffs argue that the answer key cannot be a "trade" secret because "there is no value [in] the information to the competitors (because there are none)." The plaintiffs read the fourth *Town & Country* factor too narrowly.[12] The department has a statutory duty to obtain value for ratepayers. Thus, although it has no *direct* competitors, the department is nevertheless a participant in the industry with a direct interest in ensuring competitive rates. There is no rational reason to exclude the department from trade secret protection simply because it seeks to cultivate a competitive market of bidders as opposed to being itself a bidder in the industry.

Second, the court concluded that there was sufficient evidence before the commission for it to find both that (1) the information held economic value to the department on the basis of the evidence presented concerning the resources expended to develop it, its value to the market, and the significance of the projects to ratepayers and (2) the information's value to the department derived from its being held confidential from the market at large. Our review of the record confirms that these findings were fully supported by the evidence. The purpose of the RFP was to obtain significant savings to ratepayers at a statewide level. The commission found that the renewable energy market is highly competitive. If made public, as the department testified, bidders would be able to extract sensitive details about developer submitted pricing information and departmental analyses, including details that would aid in future bids. Significant consequences, thus, could result to ratepayers in the state. Although the plaintiffs question the necessity of the answer key's secrecy, we cannot disturb the commission's conclusion when the evidence in the record supports it. The record as a whole reflects that the answer key's entire benefit relies on the department holding it in confidence in order to ensure the integrity of the undertaking for public benefit.

The plaintiffs' hyperbolic argument that classifying the department's conduct as a trade would render the act "useless, as every government agency could claim an exemption," misses the point. If acting as a regulator could never constitute trade, then it would eviscerate the ability of a public agency to raise the trade secret exemption when necessitated by the public interest. As our Supreme Court has observed, the act "does not confer upon the public an absolute right to all government information." *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 328, 435 A.2d 353 (1980). Rather, it "reflects a legislative intention to balance the public's right to know what its agencies are doing, with the governmental and private needs for confidentiality." Id. *Wilson* directs the court to balance these countervailing interests as they apply to the case before it, in order to determine the applicability of the exemptions in the act. See *Commissioner of Consumer Protection* v. *Freedom of Information Commission*, 207 Conn. 698, 701, 542 A.2d 321 (1988).

The present case actually provides a more compelling rationale for secrecy than that which was provided in *UConn*. The enterprise undertaken by the department aims to provide added benefit for ratepayers, as directed by statute. In other words, this case represents a quintessential example of a public agency acting on its statutory mandate to protect the public interest. See footnote 11 of this opinion. The state has an interest in the benefits that accrue from the RFP process. See *UConn*, supra, 303 Conn. 736–37 ("It cannot reasonably be questioned that the university expends considerable resources of the state . . . . The state's ability to recoup costs or reap the financial benefits for such efforts would be seriously undermined if any member of the public could obtain such information simply by filing a request under the act. . . . Although the act embodies a public policy in favor of disclosure, that presumption is subject to clear limits within which the university may claim an exemption." (Citations omitted.)) Here, the stakes are considerably higher than what was at issue in *UConn*. The present case deals not with an institution's customer lists but with statewide utilities delivering value to the public. We further note the need for caution when a party seeking disclosure is not a disinterested member of the public but an industry competitor that participates in bidding processes conducted by the department. See id., 728 n.5.

In light of the foregoing, we conclude that the court properly determined that the commission's conclusion that the answer key required confidentiality was supported by substantial evidence and that the department met its burden of proving that the answer key met the statutory trade secret criteria. Accordingly, the plaintiffs' first claim fails.

II

The plaintiffs next claim that the answer key does not constitute a "secret" within the term "trade secret." In support of this contention, the plaintiffs raise two arguments. First, they argue that the Superior Court misapplied the "secrecy" requirement of § 1-210 (b) (5) (A) (ii) in this case because the department did not make reasonable efforts to maintain the secrecy of the information in the answer key. Second, they argue that the information was not "given in confidence" to the department under § 1-210 (b) (5) (B)[13] because the developers did not have a reasonable expectation that their information would be kept private. We disagree.

The following additional facts, as found by the commission, are relevant to this claim. When the department issued the RFP, it "required bidders to submit copies of a 'public version' of each proposal. If a bidder chose to redact information that it deemed to be 'confidential business information' from the public version of its proposal, then it was also required to submit an unredacted version of the proposal and to identify all confidential or proprietary information, including pricing. The public version of each proposal was posted on the public website established for the New England Clean Energy RFP." The RFP required that any communications concerning it be submitted via e-mail to the team and prohibited bidders from direct contact with any member of the team and any related consultant.

"The RFP informed bidders that: 'The [e]valuation [t]eam shall use commercially reasonable efforts to treat the confidential information that it receives from bidders in a confidential manner and will not use such information for any purpose other than in connection with this RFP. . . . If confidential information is sought in any regulatory or judicial inquiry or proceeding or pursuant to a request for information by a government agency with supervisory authority over any of the EDCs, reasonable steps shall be taken to limit disclosure and use of said confidential information through the use of nondisclosure agreements or requests for orders seeking protective treatment, and bidders shall be informed that the confidential information is being sought.' "

"The RFP also advised bidders that: 'As it has done with previous RFPs, [the department] intends to disclose certain bid information in its final determination once contract negotiations are completed and a filing is made with PURA . . . . At this time, [the department] anticipates such disclosure will include some information attributed to named projects responsive to the [Connecticut] portion of the RFP: specifically, the qualitative and quantitative score and threshold eligibility determinations attributed to specific projects responsive to the [Connecticut] portion of this RFP, and pricing data for winning bids. [The department] may also disclose aggregate or average pricing data for all bids

responsive to the [Connecticut] portion of the RFP but without attribution to specific projects.' "

Appendix G of the RFP stated, as pertaining to Connecticut: "With this submission of information claimed and labeled as confidential, you must provide the legal basis for your confidentiality claim, describe what efforts have been taken to keep the information confidential, and provide whether the information sought to be protected has an independent economic value by not being readily known in the industry. With your legal support and reasonable justification for confidentiality . . . the Connecticut state agencies participating on the Soliciting Parties will be better equipped to safeguard your confidential information should it become the subject of [an inquiry under the act]. . . . All information for winning bidders, including confidential information, will be released and become public 180 days after contracts have been executed and approved by all relevant regulatory authorities, unless otherwise ordered by the Connecticut PURA."

Representatives from both intervenors testified at the hearing before the commission that they relied on the department's assurances of discretion. Cassadaga submitted its proposal in both redacted and unredacted form with the understanding that the department would keep its information confidential and notify it in the event of a request for disclosure. Cassadaga also obtained two protective orders from PURA, which remained in effect at the time of the hearings before the commission. A representative from Cassadaga testified that the records in question were sensitive and included information protected by third-party nondisclosure agreements into which Cassadaga had entered. A representative from Antrim testified that its information was also highly sensitive and valuable and, where applicable, covered by third-party nondisclosure agreements. Antrim relied on the RFP's representations in submitting both redacted and unredacted proposals to the department along with a letter outlining its need for confidentiality. In the absence of the RFP's assurances, Antrim testified that it would not have submitted a proposal.

The commission found that "the renewable energy market and the procurement process for renewable energy is highly competitive, and that the information at issue in this matter including, but not limited to, costs, pricing and bidding information, is highly market sensitive and unique to the particular RFP proposals." The commission further found that the department took various measures to keep the answer key confidential. Namely, "[t]he specific criteria and information provided by [the department] were shared only with those individuals on the [team] and Levitan. Further, within [the department], limited access to the [a]nswer [k]ey was granted only to a small set of employees within its

Bureau of Energy and Technology Policy assigned to work on the procurement process.[14] During the PURA regulatory review of the executed contracts, [the department] also sought to protect the [a]nswer [k]ey by filing a motion for protective order, which was granted and still in effect at the time of the hearings in this matter." (Footnote added.)

The commission also found that Levitan and the team members were required to sign nondisclosure agreements. The EDC representatives on the team were further required to sign an agreement, known as the "Utility Standard of Conduct," that barred them from discussing the RFP with EDC personnel involved in the RFP bidding process. Accordingly, the commission concluded, and the court agreed, that the answer key derived independent economic value from its secrecy and, accordingly, that it is a trade secret exempt from disclosure under § 1-210 (b) (5) (A).

On appeal, the plaintiffs first argue that the information in the answer key was neither "the subject of efforts that are reasonable under the circumstances to maintain secrecy" in accordance with § 1-210 (b) (5) (A) (ii), nor "[c]ommercial or financial information given in confidence, not required by statute," to the department in accordance with § 1-210 (b) (5) (B), because the department failed to ensure confidentiality by imposing sufficient restrictions in the form of nondisclosure agreements. They insist that there was no evidence to support the commission's findings that nondisclosure agreements existed because testimony was conflicting and the department did not produce the agreements[15] and, thus, they argue that when the Utility Standard of Conduct expired, there was no further obligation of confidentiality. The plaintiffs also advance the closely related argument that the information was not "given in confidence" per § 1-210 (b) (5) (B) on the basis of (1) their claim that nondisclosure agreements were not produced and (2) the department's representations to bidders concerning the public disclosure of information, which they claim meant that the bidders "had no reasonable expectation that their bids would be held in confidence." The plaintiffs' arguments are unavailing.

The requirement of § 1-210 (b) (5) (A) (ii) is highly fact specific and focuses on reasonableness. "The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry. . . . What may be adequate under the peculiar facts of one case might be considered inadequate under the facts of another. According to [General Statutes] § 35-51 (d) (2), the efforts need only be reasonable under the circumstances . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 80. As for the "given in confidence" requirement, we have

not had occasion previously to interpret it. In its decision, the commission construed the phrase "commercial or financial information, given in confidence," which is contained within § 1-210 (b) (5) (B).[16] Noting that "Connecticut appellate case law has not defined [the phrase]," the commission looked to federal case law for guidance, as well as to Connecticut authority in *Lash* v. *Freedom of Information Commission*, 300 Conn. 511, 14 A.3d 998 (2011), *Dept. of Public Utilities* v. *Freedom of Information Commission*, Superior Court, judicial district of New Britain, Docket No. CV-99-0498510-S (January 12, 2001) (29 Conn. L. Rptr. 215), and *Chief of Staff* v. *Freedom of Information Commission*, Superior Court, judicial district of New Britain, Docket No. CV-98-0492654-S (August 12, 1999) (25 Conn. L. Rptr. 270). The commission concluded that " 'given in confidence' . . . requires an intent to give confidential information, based on context or inference, such as where there is an express or implied assurance of confidentiality, where the information is not available to the public from any other source, or where the information is such that [it] would not customarily be disclosed by the person who provided it." The Superior Court subsequently concluded that "the commission's construction of the phrases 'given in confidence' and 'not required by statute' was careful, thorough, and consistent with the principles of statutory construction applied by Connecticut's courts." We agree with the commission's well reasoned analysis.

The record before us belies the plaintiffs' argument that the commission clearly erred in finding that nondisclosure agreements had been made. The commission's finding is supported by the testimony offered at the hearing before the commission. It is further supported by the evidence that Cassadaga and Antrim relied on confidentiality guarantees, as well as on the department's other efforts to maintain secrecy, such as pursuing protective orders. We must defer to the commission's findings of fact, which were sufficiently supported by the evidence before it.

As the court correctly noted, this case readily is distinguishable from *Dept. of Public Utilities* v. *Freedom of Information Commission*, supra, 55 Conn. App. 532, in which there was "no evidence that the study was to be kept confidential." In that case, the lack of a confidentiality agreement or other "efforts to limit . . . dissemination," as well as the wide distribution of the information at issue, defeated the claim of secrecy. Id., 533. The plaintiffs claim that *Dept. of Public Utilities* is "directly on point" because of the lack of nondisclosure agreements in the present case, but the evidence here supports the findings by the commission and the court that nondisclosure agreements had been executed.[17] Similarly, the plaintiffs' reliance on *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 86, for the proposition that "precautionary measures [such as] requiring

employees to sign confidentiality agreements" are important, is misplaced because, unlike in *Elm City Cheese Co.*, the record here indicates that nondisclosure agreements were produced. The commission was free to weigh the testimony before it and conclude that nondisclosure agreements had bound the team. "[B]ecause the [commission] is the [fact finder] in this case, we decline to appraise and weigh the evidence considered by the [commission] in reaching its determination on the challenged findings." *Board of Education* v. *Freedom of Information Commission*, 208 Conn. 442, 452, 545 A.2d 1064 (1988). Accordingly, we reject the plaintiffs' claim that the time limited Utility Standard of Conduct is the only agreement in play here,[18] and, thus, the plaintiffs' reliance on case law in which time limited nondisclosure agreements were insufficient to afford trade secret protection is inapplicable here.

The plaintiffs also argue that the RFP put bidders on notice that the information was subject to disclosure. Read in full, the RFP plainly advised bidders that certain information would be disclosed and that other information would be kept confidential. The RFP disclosed to bidders that, "[a]s it has done with previous RFPs, [the department] intends to disclose *certain* bid information in its final determination once contract negotiations are completed and a filing is made with PURA . . . ." (Emphasis added.) At the same time, Appendix G of the RFP contained a disclaimer regarding the act, advising that "[w]ith your legal support and *reasonable justification for confidentiality* . . . the Connecticut state agencies participating on the Soliciting Parties *will be better equipped to safeguard your confidential information should it become the subject of a Connecticut Freedom of Information Act inquiry.* . . . All information for winning bidders, including confidential information, will be released and become public 180 days after contracts have been executed and approved by all relevant regulatory authorities, *unless otherwise ordered by the Connecticut PURA.*" (Emphasis added.) The plain language of the RFP makes clear that if a bidder requested, with appropriate justification, that its information be held confidential, the department would take measures to protect it. Moreover, the RFP, as the court put it, "contained an important qualifier: it indicated that information would be disclosed unless otherwise ordered by PURA." (Internal quotation marks omitted.) The commission found that Cassadaga, per the testimony of its representative, relied on this qualifier in submitting its bid and sought protective orders, which were granted by PURA. Antrim's representative also testified that it relied on the RFP's assurances of confidentiality and discretion. We agree that there was substantial evidence to support the conclusion that the department intended to give express assurances of, and that the bidders had resulting expectations of, confidentiality.

The context of the situation also indicates that confidentiality was implied by the representations and conduct of the parties involved in the RFP. Our review of the record supports the commission's finding that there was a clear understanding between the department and the bidders that sensitive information would be protected. Ignoring the evidence in the record, the plaintiffs argue that the decision of the Superior Court in *Chief of Staff* v. *Freedom of Information Commission*, supra, 25 Conn. L. Rptr. 271, in which the administrative record disclosed that the city of Hartford (city) had given "no express assurance of confidentiality" to developers responding to an RFP, applies to the present case. However, the court in *Chief of Staff* construed the trade secret exemption as referring to the provision of information both "under an express assurance of confidentiality *or in circumstances from which such an assurance could reasonably be inferred.*" (Emphasis added; internal quotation marks omitted.) Id. Turning to that second question, the court stated that "[w]hether there was an implied assurance of confidentiality presents a close question" because a majority of the developers had an understanding of confidentiality with the city, but, fatally, the city had informed the developers that their proposals would be disseminated. Id. The court recognized that "[w]hether the circumstances show an implied assurance of confidentiality is ordinarily a question of fact" and deferred to the commission's factual finding that "the majority of the information was not given in confidence." Id. The cumulative evidence before the commission, namely the testimony concerning nondisclosure agreements and Antrim's and Cassadaga's reliance on the department's representations, sufficiently supported the commission's conclusion that the bidders and the department understood confidentiality to be an important consideration. Moreover, unlike in *Chief of Staff*, the RFP in the present case did not promise full disclosure by its terms. After reviewing the evidence before it, the commission concluded that the answer key was given in confidence.

Applying the commission's construction of the phrase "given in confidence" to the commission's findings, we agree with the trial court that the commission properly concluded that the bidders and the department mutually intended to submit and collect confidential information, respectively. This conclusion is supported by the hearing testimony provided by representatives from Cassadaga and Antrim, which the commission evidently credited. That testimony also supports the department's assertions regarding the existence of nondisclosure agreements. We therefore conclude that the commission's determination with respect to § 1-210 (b) (5) (B) is supported by the record.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The commission has adopted the brief of the department in this appeal.

[2] An Act Concerning Connecticut's Clean Energy Goals; Public Acts 2013, No. 13-303, §§ 6 and 7; was codified at General Statutes §§ 16a-3f and 16a-3g. An Act Concerning Affordable and Reliable Energy; Public Acts 2015, No. 15-107, § 1; was codified at General Statutes § 16a-3j. These three statutes provide for the department to solicit from providers of Class I renewable energy sources proposals that are in the interest of ratepayers.

[3] General Statutes § 16-1 (23) defines "electric distribution company" as "any person providing electric transmission or distribution services within the state, but does not include: (A) A private power producer, as defined in section 16-243b; (B) a municipal electric utility established under chapter 101, other than a participating municipal electric utility; (C) a municipal electric energy cooperative established under chapter 101a; (D) an electric cooperative established under chapter 597; (E) any other electric utility owned, leased, maintained, operated, managed or controlled by any unit of local government under any general statute or special act; (F) an electric supplier; (G) an entity approved to submeter pursuant to section 16-19ff; or (H) a municipality, state or federal governmental entity authorized to distribute electricity across a public highway or street pursuant to section 16-243aa . . . ."

[4] The trial court noted that it "recognize[d] the distinction between bids submitted pursuant to an invitation for bids and proposals submitted in response to a request for proposals. See *Hartford* v. *Freedom of Information Commission*, 41 Conn. App. 67, 70 n.3, 674 A.2d 462 (1996). There is no dispute that the proceeding at issue in this appeal was a request for proposals. Nevertheless, the RFP itself described the responses to the RFP as 'bids' and the developers submitting such responses as 'bidders.' . . . The commission followed this colloquial usage in its decision, and the court will similarly follow it herein." (Citation omitted.) We similarly follow this convention in this opinion.

[5] The department later abandoned its claims under § 1-210 (b) (4) and (24), and the commission did not address them in its decision.

[6] General Statutes § 1-200 (5) defines "public records" as "any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a public agency . . . ."

[7] At oral argument before this court, the department argued that, even though the answer key is geared toward the 2015 RFP, pricing information can be "back[ed] out" and the department's process could be reverse engineered to obtain future forecasts from past prices.

[8] Section 1-210 (b) (5) (A) requires only that the information derives independent economic value from its secrecy and is the subject of reasonable efforts to maintain that secrecy. Accordingly, the department may still claim a trade secret on the basis of the information's value even if the economic benefit ultimately goes to the ratepayers. In arguing that the holder of a trade secret must receive an economic benefit itself, the plaintiffs cite the Restatement (Third) of Unfair Competition, which transferred and modernized the section of the 1939 Restatement of Torts addressed in *Town & Country*. It defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." Restatement (Third), Unfair Competition § 39, p. 425 (1995). We are not persuaded that this subsequent iteration of the Restatement supports a contrary conclusion. First, it extends beyond businesses to "other enterprise[s]"; comment (d) to § 39 clarifies that "nonprofit entities such as charitable, educational, governmental, fraternal, and religious organizations can also claim trade secret protection for economically valuable information . . . ." Id., comment (d), p. 429; see also *UConn*, supra, 303 Conn. 734–35 (noting that the trade secret definition in § 1-210 (b) (5) (A) "mirrors the definition under Connecticut's Uniform Trade Secrets Act," which includes government agencies in its definition of "person"). Second, the language of § 39 also does not, on its face, require that the economic advantage must accrue to the entity claiming trade secret protection itself.

[9] Similarly, the *Town & Country* test, generally stated, looks to the information's availability, value, and cost of development and to the measures taken to maintain its secrecy. See *Town & Country*, supra, 150 Conn. 319. At its core, the test effectively seeks to conduct a cost-benefit analysis between the countervailing interests of privacy and full disclosure.

[10] We note that, although a case specific evaluation of the nature of the information still is required, information like that contained in the answer key often qualifies as a trade secret. Our Supreme Court has stated that

"financial details [such as] costs, pricing and bidding . . . fully meet the definition of trade secrets set forth in [*Town & Country*] . . . ." *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, 126, 222 A.2d 220 (1966).

[11] General Statutes § 22a-2d (a) provides in relevant part: "There is established a Department of Energy and Environmental Protection, which shall have jurisdiction relating to the preservation and protection of the air, water and other natural resources of the state, energy and policy planning and regulation and advancement of telecommunications and related technology. For the purposes of energy policy and regulation, the department shall have the following goals: (1) Reducing rates and decreasing costs for Connecticut's ratepayers, (2) ensuring the reliability and safety of our state's energy supply, (3) increasing the use of clean energy and technologies that support clean energy, and (4) developing the state's energy-related economy. . . . The Public Utilities Regulatory Authority within the department shall be responsible for all matters of rate regulation for public utilities and regulated entities under title 16 and shall promote policies that will lead to just and reasonable utility rates. . . ."

[12] The plaintiffs' appeal centers most prominently on the fourth factor. We note that the court also found that the remaining five factors of the *Town & Country* test support the classification of the answer key as a trade secret.

[13] General Statutes § 1-210 provides in relevant part: "(b) Nothing in the [act] shall be construed to require disclosure of . . . (5) . . . (B) Commercial or financial information given in confidence, not required by statute . . . ."

[14] The trial court also found that the record contained evidence that unredacted proposals were logged and stored in locked cabinets with limited access.

[15] At oral argument before this court, the department admitted that it no longer has copies of the nondisclosure agreements but asserted that, at the time of the events at issue, the agreements existed. As discussed in this opinion, the department presented sufficient evidence for the commission to make such a finding.

[16] Because the plaintiffs do not address the phrase "required by statute" in their brief, we focus solely on the "given in confidence" requirement of § 1-210 (b) (5) (B).

[17] In the trial court proceeding underlying the appeal in *UConn*, the Superior Court found that the university "also established that it has taken reasonable efforts to maintain the secrecy of the list. It has denied requests for disclosure in the past and has never provided the entire list to anyone outside of the [u]niversity." *University of Connecticut* v. *Freedom of Information Commission*, Superior Court, judicial district of New Britain, Docket No. CV-09-4021320-S (April 21, 2010) (49 Conn. L. Rptr. 856, 862), aff'd, 303 Conn. 724, 36 A.3d 663 (2012). By comparison, the department's efforts in the present case, including the execution of nondisclosure agreements and motions for protective order, similarly reflect an intent to guard the information in the answer key.

[18] The plaintiffs argue in their brief that, "[i]f the EDC representatives were required to sign nondisclosure agreements, there would have been no need for them to sign the Utility Standard of Conduct." This speculative contention is not proof of the absence of nondisclosure agreements and, in any case, it asks this court to make a factual finding, which we cannot do. See *Batista* v. *Cortes*, 203 Conn. App. 365, 372, 248 A.3d 763 (2021) (appellate court does not act as fact finder).

---